BOWEN, Presiding Judge.
Daniel L. Hunter was indicted for the robbery and kidnapping of Ruby Loflin and her brother, Raymond Davenport. He was sentenced to serve twenty years’ imprisonment (concurrent) on each of the four charges. On appeal, Hunter argues that the trial court improperly limited the evidence of his mental capacity offered in support of his defense of insanity.
At trial, Hunter’s sister, Shelby Phillips, testified to the deprived conditions under which they lived when Hunter was an infant. The trial judge would not allow Mrs. Phillips to testify that her mother brought men into the house unless an expert would testify to the “effect it has upon the defendant,” or was “going to say that a child who cannot even walk has knowledge of the men coming to the house.”
Mrs. Phillips was permitted to testify that “about seven years ago” Hunter “tried to have sex” with her. However, the trial judge refused to allow Mrs. Phillips to testify that she had sexual relations with her adoptive father when she was a child.
Linda Walker was also Hunter’s sister. She described the living conditions to which Hunter and her other brothers and sisters were subjected as children. However, the trial judge refused to let Mrs. Walker testify to any incidents of incest unless she could “specifically put the defendant there and seeing all of this stuff.” The judge ruled, “Now, you tell us only what you know of your own knowledge that you saw and which the Defendant was present at the same time, not what somebody told you happened.”
The trial judge also refused to allow Mrs. Walker to testify “as to the prostituting out of these younger half brothers — or younger sisters” unless the defense would state that Hunter would take the witness stand and “testify as to what’s in his mind and what influenced him.” The judge said, “But unless ... the defendant says he remembers these things, that’s what makes it important.” Hunter did not testify at trial.
Mrs. Phillips was recalled to the witness stand and testified outside of the jury’s presence that Mr. Hunter, her adoptive father, first had sexual relations with her when she was seven or eight years old. This continued over a period of “two or three years.” When she was sixteen, she told Hunter about this. When she was twenty-two, Hunter asked her to have sexual relations with him and told her that Mr. Hunter had told him that “it was good,” and that she had “come to him [the father] for it.” Mrs. Phillips was not allowed to recount this testimony before the jury.
*1081 Clinical psychologist C. Van Rosen testified as a defense witness that Hunter had a full scale I.Q. of 80, which placed him in a category of “borderline intellectual functioning.” He stated that Hunter is and was “suffering from a mental disease” and that he did not possess a substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law on March 29, 1984, the date of the crimes. It was Dr. Rosen’s opinion that Hunter was suffering from fairly severe depression, mixed personality disorder, and borderline intellectual functioning.
Dr. Rosen testified that Hunter “had an unfortunate early environment” and stated, “The first year or so of life is extremely critical for the development of later skills. If the evidence shows that Daniel was malnourished and treated badly, this would have a profound effect on his later development. I think in that case, it would explain to some extent his low intellectual abilities.”
Dr. Michael G. Sumner, a psychiatrist, testified as a rebuttal witness for the State. He diagnosed Hunter as suffering from borderline mental retardation and “unso-cialized adjustment reaction of adolescence with sociopathic features.” He felt that Hunter’s criminal behavior was “irrational and self destructive” but did believe that “he is not psychotic, but rather confused in role and extraordinarily ineffectual.”
Dr. Sumner testified on cross-examination by defense counsel that Hunter’s mother was an alcoholic and that “we’re dealing with fetal malnutrition so that we’re dealing with a damaged brain to begin with. There are certainly other early childhood malnutrition on the history that I obtained. So it, you know, the brain growth for the first two years of life, if you’re not getting adequate nutrition, you’re fouling up the growth of the brain, so you’re dealing with a kid who — that in a sense, we sort of made stupid.” He further stated that “there was a lot of incest that was taking place in the family. It was just a very chaotic family background.” He testified that incest may cause brain damage and that “the programming that Daniel received was faulty.”
The appellate courts of this state have indulged a very wide latitude in inquiries into a person’s mental capacity. “[T]he rule governing admissibility is no longer ‘every act of the party’s life is relevant to the issue,’ but rather ‘every act of the party’s life which throws light on the inquiry as to his mental capacity at the time in issue is relevant to the inquiry.’ ” J. McElroy, Relevancy of Evidence in Alabama Upon An Issue of A Person’s Mental Capacity, 4 Ala.Law. 884 (1943).
“The continuous theme of the Alabama decisions has been that ‘wide latitude’ is allowed in inquiries into a person’s mental capacity, and accompanying that theme has been the commitment, to a measurable degree, of the boundaries of that latitude to the discretion of the trial court. With the investiture of a measurable discretion in the trial court, no legitimate fault can be found. The variety of kinds and qualities of human acts, and the variety in the degree of continuity of mental conditions of various persons, are so infinite as to frustrate any attempt to prescribe by precise rule what acts shall be admissible or inadmissible upon the issue of a person’s mental capacity, and also to frustrate any attempt to limit, precisely, the period of time within which his acts must have occurred to be the subject of inquiry. That it may be found appropriate by reason of the principle of Undue Prejudice to formulate a rule restricting to some extent the field of trial-court discretion, does not imply by any means that the area of that field will be materially diminished thereby. On the contrary, the method of trial-court discretion will continue to be the only feasible means of dealing with innumerable items of the person’s conduct. But a warning needs here to be sounded to trial judges: Many reversals of judgments of major importance have resulted from the trial court’s too strictly limiting the evidence upon an issue of mental capacity; if the *1082 ' trial judge is in doubt as to whether evidence is admissible of a particular act of the person whose mental capacity is in issue, the safer and sounder course is to admit the evidence.” Id. at 385-86.
See also C. Gamble, McElroy’s Alabama Evidence §§ 61.01(6) and (7) (3rd ed. 1977).
We find no abuse of discretion by the trial judge in refusing to admit testimony that Hunter’s sisters had incestuous relationships with their father where it could not be shown that these illicit relationships were relevant to have “naturally and reasonably affected his mental poise to an extent as to have rendered him legally irresponsible while acting under its influence:”
“Matters observed by the subject-person prior to the time in issue, including communications to him, which are calculated to cause him shock or mental disturbance are admissible as tending to show mental incapacity. The only qualification upon the admission of such evidence is that the matter or communication must be shown to have been perceived or heard by the subject-person and must be shown relevant to have naturally and reasonably affected his mental poise to an extent as to have rendered him legally irresponsible while acting under its influence.” McElroy’s at § 61.01(10).
“While much latitude of proof is given ... this is subject to the wise discretion of the court to limit the scope of the examination within due bounds.” Mullis v. State, 258 Ala. 309, 313, 62 So.2d 451 (1952) (“In the case at bar the court did not abuse its discretion in refusing to allow proof that when the defendant was 9 years of age, his father was not working and what the probation authorities did with him at that time and that as a child he was moody, quaint, or peculiar.”).
“Subject to the wise discretion of the trial court to limit the scope of the examination within due bounds, it is competent to show any circumstance or condition calculated to naturally or reasonably affect defendant’s mental poise at the time of the homicide. Barnes v. State, 31 Ala.App. 187, 14 So.2d 242; Wharton, Crim. Evidence, 11th Ed., Vol. 1, § 318.
“Following is an apposite statement of the principle: ‘As human conditions of every sort are created or influenced by external environment, so too the diseased mental condition which we term insanity may be precipitated, intensified, or otherwise affected by external events coming to the apprehension of the person. Accordingly, circumstances calculated to induce this mental condition may always be admitted to evidence the probability of such affection; the only limitation is that the circumstance be in itself capable in some degree of producing such an effect, that it came to the person’s knowledge, and that some further foundation for probability be laid by other evidence that there was a diseased mental condition.’ 2 Wigmore on Evidence, § 231, page 20.” Eldridge v. State, 247 Ala. 153, 154, 22 So.2d 713 (1945) (emphasis in original).
See also McElroy’s § 61.01(5) (“Some decisions have held that the trial court has the discretion to admit or exclude a particular fact, offered to show mental capacity, because of its remoteness. However, ... it is the safer and better practice to exercise such discretion by admitting any fact which tends in reason to prove such person's mental capacity.”). Here, there was no evidence that a brother’s subsequent knowledge of the details of an incestuous relationship between his father and his sister, was calculated to naturally or reasonably affect that brother’s mental condition at the time of the crimes.
While the trial judge’s ruling in this case was restrictive, that ruling was not abusive of his discretion. Although the trial judge’s statements of his reasons for not admitting the desired testimony are not the clearest, the substance and effect of the judge’s rulings, as we perceive them, were that he would only allow testimony of various events, relationships, and circumstances which could be shown to have affected or influenced the defendant’s conduct and thought and that only relevant evidence would be admitted.
*1083 To the extent that the trial judge ruled that Mrs. Phillips could not testify to what Hunter told her that he had been told, the rulings were error. “[N]o such rule applies in the area of mental capacity. A party’s conduct, including his declarations, are admissible when offered to show his own mental incapacity or capacity.” McElroy’s at § 61.01(4).
By the time the trial was over, the jury knew that Hunter had a deprived and deplorable childhood and “that there was a lot of incest taking place in the family.” Even more significant in proving Hunter’s mental condition was Dr. Sumner’s testimony that Hunter’s “programming was faulty,” the insinuation being that Hunter himself was the product of an incestuous relationship which impaired his mental capacity.
Under the circumstances of this case, we are clear and certain to the conclusion that no harm was caused by the exclusion of the details of Hunter’s childhood experiences when considered with the details which were admitted. We are convinced that the verdict would have been the same even had the rejected evidence been admitted. See Rule 45, A.R.App.P.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.